UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
DANIEL GOLDSTEIN, *et al.*,

                                    Plaintiffs,                    REPORT AND
                                                                  RECOMMENDATION

        -against-
                                                                  06 CV 5827 (NGG) (RML)

GEORGE E. PATAKI, *et al.*,

                                    Defendants.
-------------------------------------------------------X

LEVY, United States Magistrate Judge:

        All defendants move to dismiss the complaint, pursuant to Rules 12(b)(1) and

12(b)(6) of the Federal Rules of Civil Procedure.  On November 21, 2006, the Honorable

Nicholas G. Garaufis, United States District Judge, referred the motions to me for Report and

Recommendation.  Briefing was completed on February 1, 2007, and this court heard oral

argument on February 7, 2007.  For the reasons stated below, I respectfully recommend that

defendants' motions be granted.

## BACKGROUND AND PROCEDURAL HISTORY

### A.  The Plaintiffs and Their Claims

        Plaintiffs Daniel Goldstein, Jerry Campbell (as the putative administrator of the

estate of Oliver St. Clair Stewart and in his individual capacity), The Gelin Group, LLC,

Chadderton's Bar and Grill Inc. d/b/a/ Freddy's Bar and Backroom, Maria Gonzalez, Jackie

Gonzalez, Yesenia Gonzalez, Huda Mufleh-Odeh, Jan Akhtar, David Sheets, Joseph Pastore,

Peter Williams, Peter Williams Enterprises, Inc., Henry Weinstein, 535 Carleton Ave. Realty

Corp., 535 Carlton Ave. Realty Corp., and Pacific Carlton Development Corp. (collectively,

"plaintiffs") commenced this action on October 26, 2006[1] seeking to enjoin the exercise of eminent domain to seize their properties in connection with a project known as the Atlantic Yards Arena and Redevelopment Project (the "Atlantic Yards Project" or the "Project"). As currently proposed, the Project is a mixed-use redevelopment project that would cover approximately twenty-two acres of land in and around the Metropolitan Transportation Authority's Vanderbilt Yards in Brooklyn, New York. (See Amended Complaint, dated Jan. 5, 2007 ("Am. Compl."), at 2 n.1.) It includes a sports arena with seating capacity for approximately 20,500,[2] sixteen high-rise apartment and office towers containing approximately eight million square feet of residential, office and commercial space, and a 180-room hotel. (Id.)

Plaintiffs own or rent property within the footprint of the Project. (See id. ¶¶ 6-21.)[3] They challenge the use of eminent domain under 42 U.S.C. § 1983,[4] asserting claims under the Fifth Amendment's Takings Clause (as incorporated by the Fourteenth Amendment), which

[1] Plaintiffs amended their complaint on January 5, 2007 to, *inter alia*, add some of the named plaintiffs listed above and eliminate a claim against former Governor Pataki in his official capacity. (See Amended Complaint, dated Jan. 5, 2007.)

[2] The arena is slated to be home to the New Jersey Nets National Basketball Association Team. (See Declaration of Douglas M. Kraus, Esq., dated Dec. 15, 2006, Ex. E.)

[3] Plaintiffs Daniel Goldstein, Jerry Campbell, the Estate of Oliver St. Clair Stewart, The Gelin Group LLC, Peter Williams, Peter Williams Enterprises, Inc., 535 Carleton Ave. Realty Corp., 535 Carlton Ave. Realty Corp., Henry Weinstein, and Pacific Carlton Development Corp. own and control real property. (Am. Compl. ¶¶ 6-8.) Plaintiff Chadderton's Bar and Grill Inc. d/b/a Freddy's Bar and Backroom has a lease for operation of a commercial enterprise. (Id. ¶ 9.) Plaintiffs Maria Gonzalez, Jackie Gonzalez, Yesenia Gonzalez, Huda Mufleh-Odeh, Jan Akhtar, David Sheets, and Joseph Pastore are residential tenants. (Id. ¶¶ 14 - 20.)

[4] Section 1983 imposes liability on persons – including, by judicial construction, municipalities and other state agencies – who, acting under color of state law, deprive others of rights secured by the Constitution and federal laws. 42 U.S.C. § 1983 (2000).

prohibits the taking of private property "for public use, without just compensation,"[5] and the

Fourteenth Amendment's Equal Protection[6] and Procedural Due Process[7] Clauses.  (See id. ¶¶

131-170.)  They also assert a supplemental state law claim under New York Eminent Domain

Procedure Law ("EDPL") § 207.  (Id. ¶¶ 171-180.)[8]  Plaintiffs contend that the Project, which

they describe as "the single largest multi-use real estate development in the history of the City of

New York," constitutes "a betrayal of public trust in service of the interests of a private

developer," namely defendant Bruce C. Ratner ("Ratner") and the companies he owns or

controls.  (Id. ¶ 2.)  They accuse City and State officials of acting in concert with Ratner for the

purpose of conferring a private benefit on the developer, who allegedly conceived of and

---

[5]  Similarly, Article 1, § 7(a) of the New York State constitution provides that "[p]rivate property shall not be taken for public use without just compensation."  However, the Amended Complaint contains no claim under the state constitution.

[6]  For their Equal Protection claim, plaintiffs allege that "[b]y selecting plaintiffs' properties to be taken for the purpose of conferring a benefit, here the plaintiffs' property, to [the private developer], defendants have targeted plaintiffs for adverse treatment for no rational purpose."  (Am. Compl. ¶ 151.)  As plaintiffs' counsel conceded at oral argument, this claim "will rise or fall with the public use claim."  (Transcript of Oral Argument, dated Feb. 7, 2007 ("Tr."), at 51.)

[7]  Plaintiffs allege that defendants have deprived them of their property interests without due process of law by, inter alia, "(1) circumventing local and community review and local zoning regulations; (2) failing to provide sufficient time to meaningfully respond between the release of the Draft Environmental Impact Statement and the hearing on August 23, 2006; (3) failing to provide a hearing that allowed plaintiffs to meaningfully state their objections; and (4) at all times providing an empty, meaningless [] process, with a pre-determined outcome. . . ."  (Am. Compl. ¶ 164.)

[8]  This claim is only asserted against the Empire State Development Corp.  The Amended Complaint also asserted a claim under EDPL § 204(A) (see Am. Compl. ¶ 178 (alleging that the Determination and Findings are null and void because they were not made within 90 days of the close of the public hearing), but plaintiffs have since withdrawn that claim.  (See Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' Supplemental EDPL Claims, dated Jan. 26, 2007, at 14 n.5.)

initiated the Project.  (Id.)  They further maintain that "public input and review has been a sham" and that the defendants' findings of blight in the area are pretextual, as are their claims that the Project will result in a net economic benefit to the City and State, create significant affordable housing, and create thousands of new jobs.  (Id. ¶¶ 4, 89-120.)  Plaintiffs have stated that they intend to move for a preliminary injunction.

B.  The Defendants and Their Motions

The defendants fall into four groups.  They are: (1) the New York State Urban Development Corporation d/b/a the Empire State Development Corporation (the "ESDC"), a state public benefit corporation created pursuant to the New York State Urban Development Corporation Act of 1968 (the "UDC Act") and imbued by the New York legislature with eminent domain power (see N.Y. UNCONSOL. LAWS § 6263); and the ESDC's Chairman and Chief Executive Officer, Charles A. Gargano, sued in both his official and individual capacities; (2) former Governor George E. Pataki, sued in his individual capacity; (3) the City of New York; the New York City Economic Development Corporation; Mayor Michael Bloomberg; Deputy Mayor Daniel L. Doctoroff; Andrew Alper, former President of the New York City Economic Development Corporation; and Joshua Sirefman, Acting President of the New York City Economic Development Corporation, all sued in both their official and individual capacities (collectively, the "City defendants"); and (4) Bruce C. Ratner, James P. Stuckey, Forest City Enterprises, Inc., Forest City Ratner Company, Ratner Group, Inc., BR FCRC, LLC, BR Land, LLC, FCR Land, LLC, Brooklyn Arena, LLC, and Atlantic Yards Development Company, LLC (collectively, the "Forest City Ratner defendants").

All defendants move to dismiss the complaint on the grounds that it is not ripe

and that it fails to state a claim upon which relief can be granted. They also urge this court to abstain from exercising federal jurisdiction under <u>Younger v. Harris</u>, 401 U.S. 37 (1971), or <u>Burford v. Sun Oil Co.</u>, 319 U.S. 315 (1943).

In addition to arguing that the complaint fails to state a claim under the public use clause, the Forest City Ratner defendants contend that plaintiffs' assertions of favoritism and of a "sham" review process "amount to a claim that defendants have acted corruptly and perpetrated a fraud on the public," which purportedly fails to comport with the heightened pleading requirement of Fed. R. Civ. P. 9(b). (<u>See</u> Forest City Ratner Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Complaint, dated Dec. 15, 2006, at 19 n.14, 23-24.) They also challenge plaintiffs' equal protection and due process claims as insufficient. (<u>Id.</u> at 24-28.)

Governor Pataki moves separately to dismiss the claims against him in his individual capacity on the grounds that plaintiffs do not allege his personal involvement in the alleged constitutional deprivation and because he is entitled to qualified immunity. (<u>See</u> Memorandum of Law of Defendant George E. Pataki in Support of His Motion to Dismiss the Complaint, dated Dec. 15, 2006 ("Pataki Mem."), at 10-13; Reply Memorandum of Law of Governor George E. Pataki in Support of His Motion to Dismiss the Amended Complaint, dated Jan. 19, 2007 ("Pataki Reply Mem.").) The Governor also argues that the claims against him in his individual capacity are moot, as he completed his term of office on December 31, 2006, prior to the taking of plaintiffs' properties. (Pataki Mem. at 13-14; Pataki Reply Mem. at 4-6.)

Last, the City defendants move separately to dismiss the claims against them in both their individual and official capacities. (<u>See</u> Memorandum of Law in Support of City

Defendants' Motion to Dismiss the Complaint, dated Dec. 15, 2006.)  They argue that the

Amended Complaint does not support the imposition of liability against them in their individual

capacities because it does not allege specific facts showing each defendant's personal

involvement in the condemnations.  (Id. at 3-5.)  They also contend that they are entitled to

qualified immunity under section 1983 because it was objectively reasonable for them to believe

that their conduct did not violate the law.  (Id. at 6-7.)  Finally, they maintain that the Amended

Complaint does not state a cause of action against them in their official capacities because it does

not allege that either the City or the EDC is the "moving force" behind the challenged

condemnation proceedings.  (Id. at 7-8.)  Although plaintiffs allege that all of the defendants

conspired with each other to deprive them of their constitutional rights, the City defendants

argue that the allegations concerning their role in the purported conspiracy should be dismissed

as "conclusory" and "nonspecific."  (Id. at 8.)

        C.  <u>The Eminent Domain Procedure Law</u>

        For purposes of context, a description of New York's EDPL, which provides a

detailed and comprehensive statutory scheme for the taking of property, is in order. Until the

state legislature enacted the EDPL in 1977, eminent domain powers were exercised through a

patchwork of more than 150 disparate state and local provisions.  <u>Jackson v. N.Y. State Urban

Dev. Corp.</u>, 494 N.E.2d 429, 436 (N.Y. 1986).  Briefly, Article 2 of the EDPL sets forth the

procedures that most condemnors must follow prior to acquiring property.  Specifically, it

requires condemnors to hold a non-judicial public hearing to review the public use of the

proposed project and its impact on the environment.  <u>See</u> EDPL § 201 (McKinney 2003 & Supp.

2006).  Further, the EDPL requires that condemnors give notice of the hearing by publication

and, since January 2005, requires that affected property owners be given individualized notice, either by personal service or certified mail.  See id. § 202.  Within ninety days of the conclusion of public hearings, the condemnor is required to publish its Determination and Findings, see id. § 204(A), which triggers an exclusive thirty-day period in which such Determination and Findings may be appealed in the Appellate Division.  See id. § 207.  The Determination and Findings must specify "(1) the public use, benefit or purpose to be served by the proposed public project; (2) the approximate location for the proposed public project and the reasons for selection of that location; (3) the general effect of the proposed project on the environment and residents of the locality."  Id. § 204(B).  Recent amendments to the EDPL also require that individuals whose properties are being condemned be given individualized notice of both the publication of the Determination and Findings and the thirty-day time limit on judicial challenges thereto.  See id. § 204(C).

Section 207(B) of the EDPL states that, once a condemnee challenges the Determination and Findings in the Appellate Division, the "jurisdiction of the appellate division of the supreme court shall be exclusive and its judgment and order shall be final subject to review by the court of appeals. . . ."  The scope of review in the Appellate Division is narrow.  It is "limited to whether: (1) the proceeding was in conformity with the federal and state constitutions, (2) the proposed acquisition is within the condemnor's statutory jurisdiction or authority, (3) the condemnor's determination and findings were made in accordance with procedures set forth in this article and with article eight of the environmental conservation law, and (4) a public use, benefit or purpose will be served by the proposed acquisition."  Id.

§ 207(C).[9]  "'The principal purpose of EDPL article 2 is to insure that [a condemnor] does not acquire property without having made a reasoned determination that the condemnation will serve a valid public purpose.'"  Waldo's Inc. v. Vill. of Johnson City, 534 N.Y.S.2d 723, 725 (3d Dep't 1988) (quoting Jackson, 494 N.E.2d 429), aff'd, 543 N.E.2d 74 (N.Y. 1989); accord Woodfield Equities, LLC v. Inc. Vill. of Patchogue, 813 N.Y.S.2d 184 (2d Dep't 2006).

Upon filing a petition pursuant to EDPL § 207, the petitioner must serve a demand on the condemnor to file with the court a written transcript of the public hearing and a copy of its Determination and Findings.  See EDPL § 207(A).  The proceeding is then heard "on the record," with no discovery or evidentiary hearing.  Id.  See also Kaufmann's Carousel, Inc. v. City of Syracuse Indus. Dev. Agency, 750 N.Y.S.2d 212, 222 (4th Dep't 2002) (newspaper article appended to the EDPL petition challenging the condemnor's Determination and Findings was outside the record and therefore could not be considered by the Appellate Division), leave to appeal denied, 787 N.E.2d 1165 (N.Y. 2003); Waldo's, Inc., 534 N.Y.S.2d at 725 (stating that EDPL § 207 "does not provide for . . . adversarial proceedings."); Vill. Auto Body Works, Inc. v. Inc. Vill. of Westbury,  454 N.Y.S.2d 741, 743 (2d Dep't 1982) (EDPL § 207 "contemplates a summary review procedure.  This court is to review the record and either reject or confirm the findings of the condemning authority.").

Article 3 of the EDPL then controls the making of compensation offers for property that is subject to condemnation.  The preamble to Article 3 states that the public policy of New York favors negotiated settlements.  EDPL § 301.  However, "the condemnor fulfills[ ]

_____

[9]  In certain circumstances, not relevant here, a condemnor may be exempt from compliance with the requirements of Article 2.  See EDPL § 206.

-8-

the requirements of EDPL § 303 by making an offer to respondent property owners that 'it believes to represent just compensation for the real property to be acquired.' There is no requirement that petitioner 'plead or prove, as a prerequisite to the acquisition of property by eminent domain, that it negotiated in good faith with the [property] owner[s].'" Nat'l Fuel Gas Supply Corp. v. Town of Concord, 752 N.Y.S.2d 187, 189 (4th Dep't 2002) (quoting Oswego Hydro Partners L.P. v. Phoenix Hydro Corp., 559 N.Y.S.2d 841, 841 (4th Dep't 1990)); see also Matter of County of Tompkins, 654 N.Y.S.2d 849, 851 (3d Dep't 1997).

Under Article 4 of the EDPL, the condemnor may commence a proceeding to acquire title to the property up to three years after the later of: (1) publication of the Determination and Findings, or (2) entry of the final order or judgment on judicial review under § 207. (See EDPL § 401.) This is known as a "vesting proceeding," and the condemnor's petition must set forth (a) a statement of compliance with EDPL Article 2 (or with an exemption pursuant to EDPL 206); (b) a copy of the acquisition map; (c) a description of the property; (d) the public use; and (e) "a request that the court direct entry of an order authorizing the filing of the acquisition map . . . and that upon such filing, title shall vest in the condemnor." Id. § 402(B)(3). A condemnee opposing the taking may not wait until the condemnor initiates a vesting proceeding to raise its claims, but rather must seek review directly in the Appellate Division pursuant to EDPL § 207. See City of New Rochelle v. O. Mueller, Inc., 594 N.Y.S.2d 301, 302 (2d Dep't 1993); Matter of Farmington Access Rd., 549 N.Y.S.2d 236, 237 (4th Dep't 1989). In other words, if no prospective condemnee brings a claim in the Appellate Division pursuant to EDPL § 207, then the Article 4 proceeding is the first point of judicial review. Once the Article 4 proceeding is complete, just compensation may be adjudicated in the Court of

Claims pursuant to Article 5.

In Brody v. Vill. of Port Chester, 434 F.3d 121, 133 (2d Cir. 2005), the Second Circuit held that the EDPL's post-determination review procedure for challenging public use satisfies due process. Although EDPL § 207 provides for a post-determination hearing that is "summary in nature, restricting both the issues that can be raised and the evidence the court will consider," the Second Circuit concluded that "[d]ue process does not require New York to furnish a procedure to challenge public use beyond that which it already provides." Id.

Plaintiffs have not brought a facial challenge to the EDPL. Nor do they allege that the ESDC has failed to comply with the EDPL's requirements.

D. The Current Posture

The Project was first announced in December 2003 (Am. Compl. ¶ 68), and Memoranda of Understanding concerning the Project were signed in early 2005. (Id. ¶¶ 670-72; Declaration of Douglas M. Kraus, Esq., dated Dec. 15, 2006 ("Kraus Decl."), Exs. A, B.)[10] In May 2005, the Metropolitan Transit Authority (the "MTA") issued a request for proposals for the purchase of the development rights attributable to the Vanderbilt Yards site, an 8.5-acre rail yard and bus depot within the Project's footprint. (Am. Compl. ¶ 75.) Two companies, including the Forest City Ratner Companies ("FCRC"), submitted formal bids (id. ¶¶ 77-78), and on July 27, 2005, the MTA's Board of Directors selected FCRC as the winning bidder. (Id. ¶

---

[10] Both Memoranda of Understanding were dated February 18, 2005 and were signed by FCRC, the ESDC, the City of New York, and the New York City Economic Development Corporation. (See Krauss Decl., Exs. A, B.)

79.)[11]  On September 14, 2005, the MTA and FCRC formally announced the terms of an

agreement.  (Id. ¶ 80.)  A "Blight Study" was performed by AKRF, Inc. and completed in July

2006.  (See Declaration of Jeffrey L. Braun, Esq., dated Dec. 15, 2006 ("Braun Decl."), Ex. C.)[12]

On July 18, 2006, ESDC issued a formal declaration that the Project qualified as a land use

development and civic project under the UDC Act.  (Am. Compl. ¶ 47; Kraus Decl., Ex. E.)[13]  A

Draft Environmental Impact Statement, prepared by AKRF, Inc. and Philip Habib & Associates

pursuant to the State Environmental Quality Review Act, was also released on July 18, 2006.

(Braun Decl., Ex. B.)

On August 23, 2006, ESDC held a duly-noticed public hearing concerning the

Project, in accordance with EDPL §§ 202 and 203.  (Am. Compl. ¶ 84.)  In addition, ESDC

conducted community forums on September 12 and 18, 2006 and accepted written comments

until September 29, 2006.  (Id. ¶¶ 85-86; Memorandum of Law of ESDC Defendants in Support

of Their Motion to Dismiss the Complaint, dated Dec. 15, 2006 ("ESDC Mem."), at 8; Forest

City Ratner Defendants' Memorandum of Law in Support of Their Motion to Dismiss the

---

[11]  The other bidder was Extell Development Company.  (Am. Compl. ¶ 78.)

[12]  According to plaintiffs, FCRC paid for the blight study.  (Am. Compl. ¶ 100.)  The blight study concluded, inter alia, that the proposed Project site "has suffered from physical deterioration and relative economic inactivity for at least four decades."  It described the site as "[d]ominated by an approximately 9-acre open rail yard and otherwise generally characterized by dilapidated, vacant, and underutilized properties[.]" (Krauss Aff., Ex. D at B-1.)  Plaintiffs contest this finding, arguing that it is a "classic post-hoc justification" and that the increase in vacant lots in the area between December 2003 and October 2006 is "squarely attributable to defendants['] own conduct."  (Am. Compl. ¶¶ 98, 106.)

[13]  Under the UDC Act, the ESDC may only condemn property for a land use development project if it determines "[t]hat the area in which the project is to be located is a substandard or insanitary area, or is in danger of becoming a substandard or insanitary area and tends to impair or arrest the sound growth and development of the municipality."  N.Y. UNCONSOL. LAWS § 6260(c)(1).

Complaint, dated Dec. 15, 2006 ("FCRC Mem.") at 4 n.3.)  A Final Environmental Impact

Statement was certified as complete on November 27, 2006.  See

www.empire.state.ny.us/AtlanticYards/FEIS (last checked Feb. 6, 2007).  Pursuant to EDPL

§ 204(A), ESDC published its Determination and Findings on December 8, 2006.  In its

Determination and Findings, ESDC confirmed that it intends to exercise its eminent domain

power to acquire private properties within the Project site.  (Kraus Decl., Ex. E; ESDC Mem. at

7-8.)  On December 20, 2006, the Public Authorities Control Board, which has the power and

duty to "receive applications for approval of the financing and construction of any project

proposed by [certain specified] state public benefit corporations" (N.Y. PUB. AUTH. L., Art. 1-A,

§§ 50,51), approved the Project.

On January 11, 2007, a separate group of plaintiffs filed a petition in the New

York Appellate Division, Second Department, pursuant to EDPL § 207(B).[14]  The exclusive 30-

day period in which the ESDC's Determination and Findings may be appealed in the Appellate

Division has now passed.[15]  ESDC has yet to file an Article 4 proceeding seeking transfer of title

to plaintiffs' properties.

**DISCUSSION**

A. Standard for Motion to Dismiss under Rule 12(b)(1)

_____

[14]  The plaintiffs in that action, entitled Anderson v. New York State Urban Development
Corporation, are all rent-stabilized tenants in two buildings owned by FCRC.  Their petition
seeks, _inter alia_, a judgment rejecting the ESDC's Determination and Findings, pursuant to
EDPL § 207 "with respect to the acquisition of 624 Pacific Street and 473 Dean Street,
Brooklyn, New York, in furtherance of the Atlantic Yards Arena and Redevelopment Project."
(See Declaration of Douglas M. Kraus, Esq., dated Jan. 19, 2007, Ex. A.)

[15]  The parties disagree as to whether the 30-day period for appeal under EDPL § 207(B)
is subject to tolling under 28 U.S.C. § 1367(d).  That issue is not presently before the court.

Defendants move to dismiss plaintiffs' complaint for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1).  Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction."  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994); see also Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005) (federal courts are "courts of limited jurisdiction" whose powers are confined to statutorily and constitutionally granted authority); Gen. Motors Corp. v. EPA, 363 F.3d 442, 448 (D.C. Cir. 2004) (noting that "[a]s a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction.").  Because subject matter jurisdiction is an Article III requirement, "no action of the parties can confer subject-matter jurisdiction upon a federal court.'"  Hoeft v. MVL Grp., Inc., 343 F.3d 57, 66 (2d Cir. 2003) (quoting Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982)).

On a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject matter jurisdiction.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); Gilman v. BHC Sec., 104 F.3d 1418, 1421 (2d Cir. 1997).  However, the court may dismiss a complaint for lack of subject matter jurisdiction only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Commodity Futures Trading Comm'n v. Int'l Foreign Currency, Inc., 334 F. Supp. 2d 305, 309 (E.D.N.Y. 2004) (quoting Fortress Bible Church v. Feiner, No. 03-4235, 2004 WL 1179307, at *1 (S.D.N.Y. Mar. 29, 2004)).  Because subject matter jurisdiction focuses on the court's power to hear the claim, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim.  Macharia v. United States, 334 F.3d 61, 64, 69 (D.C. Cir.

2003), cert. denied, 540 U.S. 1149 (2004); Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). Moreover, the court is not limited to the allegations in the complaint; instead, to determine whether it has jurisdiction over the claim, the court may consider materials outside the pleadings. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986).

B. Ripeness

Defendants urge this court to dismiss the complaint for lack of subject matter jurisdiction on the ground that it is not ripe for judicial review. They argue that plaintiffs' claims will not be ripe for review until condemnation proceedings are commenced pursuant to EDPL Article 4. It is axiomatic that federal courts may adjudicate only those "real and substantial controvers[ies] admitting of specific relief . . . as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." Lewis v. Continental Bank Corp., 494 U.S. 472, 477 (1990). Thus, ripeness is a constitutional prerequisite to the exercise of federal jurisdiction. See Nutritional Health Alliance v. Shalala, 144 F.3d 220, 225 (2d Cir. 1998).

"The ripeness doctrine's basic rationale is to prevent the courts through avoidance of premature adjudication from entangling themselves in abstract disagreements." Woodfield Equities, LLC v. Inc. Vill. of Patchogue, 357 F. Supp. 2d 622, 632 (E.D.N.Y.) (internal quotation marks and citation omitted), aff'd, 156 Fed. Appx. 389 (2d Cir. 2005). The ripeness doctrine asks "whether the case has been brought at a point so early that it is not yet clear whether a real dispute to be resolved exists between the parties." 15 JAMES WM. MOORE ET AL., MOORE'S FED. PRAC. § 101.70[2] (3d ed. 1997). Because ripeness is jurisdictional and stems from the Article III requirement that federal courts hear only cases or controversies, the court is obliged to

consider the ripeness question before reaching the merits of plaintiffs' claims. See Reno v.

Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n. 18 (1993) (explaining that "[the] ripeness doctrine

is drawn both from Article III limitations on judicial power and from prudential reasons for

refusing to exercise jurisdiction."); Vandor v. Militello, 301 F.3d 37, 38 (2d Cir. 2002) ("We are

obliged to consider the ripeness question before reaching the merits of [the plaintiff's] claims

because ripeness is jurisdictional."); see also Steel Co. v. Citizens for a Better Env't, 523 U.S.

83, 84 (1998) (instructing federal courts to resolve questions of Article III jurisdiction before

reaching the merits of a plaintiff's claim).[16] Moreover, because ripeness is a jurisdictional

inquiry, the court "must presume that [it] cannot entertain [plaintiffs'] claims 'unless the contrary

appears affirmatively from the record.'" Murphy v. New Milford Zoning Comm'n, 402 F.3d

342, 347 (2d Cir. 2005) (quoting Renne v. Geary, 501 U.S. 312, 316 (1991)).

To measure ripeness, the court must look to: (1) whether the controversy is fit for

judicial adjudication; and (2) the hardship to the parties of withholding court consideration.

Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967). In essence, this approach balances the need

for decision against the risks of decision: "[t]he need to decide is a function of the probability

and importance of the anticipated injury," whereas "[t]he risks of decision are measured by the

difficulty and sensitivity of the issues presented, and by the need for further factual development

---

[16] As defendants correctly note, the Second Circuit has held that a federal court may decide to abstain without addressing Article III limitations on jurisdiction. See Spargo v. N.Y. State Comm'n on Judicial Conduct, 351 F.3d 65, 74 (2d Cir. 2003) (explaining that, although federal courts may not exercise hypothetical jurisdiction to dismiss claims on the merits, they have flexibility "'to choose among threshold grounds' for disposing of a case without reaching the merits.") (quoting Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 585 (1999)). In the interest of making a thorough Report and Recommendation on defendants' motions, I will address the issue of ripeness.

to aid decision." Charles Alan Wright, Arthur R. Miller and Edward H. Cooper, 13A FEDERAL PRACTICE AND PROCEDURE § 3532.1 (2006). With respect to the first prong, the central inquiry is whether the court would benefit from deferring initial review until the claims it is called on to consider "have arisen in a more concrete and final form." <u>Murphy</u>, 402 F.3d at 347. If a claim rests upon contingent future events that may not occur as anticipated, or may not occur at all, it is not ripe for adjudication. <u>Auerbach v. Bd. of Educ.</u>, 136 F.3d 104, 108-09 (2d Cir. 1998); <u>see also</u> <u>In re Drexel Burnham Lambert Grp., Inc.</u>, 995 F.2d 1138, 1146 (2d Cir. 1993) (stating that adjudication is inappropriate where there is "no certainty" that the complained-of action will occur). On the other hand, the "hardship to the parties" prong "injects prudential considerations into the mix," requiring the court to "gauge the risk and severity of injury to a party that will result if the exercise of jurisdiction is declined." <u>Murphy</u>, 402 F.3d at 347.

In <u>Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City</u>, 473 U.S. 172, 194-95 (1985), the Supreme Court established a two-pronged test for analyzing ripeness of claims under the Fifth Amendment's Takings Clause. <u>Williamson County</u> involved a landowner's claim in federal district court for money damages suffered when the planning commission allegedly took the landowner's property in the course of applying local land use regulations. <u>Id.</u> at 175. The Sixth Circuit upheld a jury award of money damages to the landowner (<u>Williamson County Reg'l Planning Comm'n v. Hamilton Bank</u>, 729 F.2d 402, 409 (6th Cir. 1984)), but the Supreme Court found the landowner's claim unripe on two grounds. First, the Court held that a takings claim "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." <u>Williamson County</u>, 473 U.S. at 186. A "final decision" is

a "definitive position on the issue that inflicts an actual, concrete injury." Id. at 193. In Williamson County, the Court found that the plaintiff developer had not yet obtained a final decision because it had failed to seek "variances that would have allowed it to develop the property according to its proposed plan." Id. at 188.

Second, the Court held that a takings claim is not ripe until the landowner has availed itself of the state's procedures for obtaining just compensation. Id. at 195. The Court noted that the state of Tennessee authorized landowners to bring "inverse condemnation" actions to obtain just compensation for alleged takings effected by restrictive zoning laws or development restrictions. Id. at 196. It held that the landowner "cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." Id. at 195. "The second prong of the Williamson test applies to physical as well as regulatory takings," where the plaintiff alleges a violation of the just compensation clause. RKO Delaware, Inc. v. City of N.Y., No. CV002592, 2001 WL 1329060, at *4 (E.D.N.Y. Aug. 30, 2001). See also Pascoag Reservoir & Dam, LLC v. Rhode Island, 337 F.3d 87, 92 (1st Cir. 2003) (applying the exhaustion exceptions of Williamson County to physical takings); Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 380 (2d Cir. 1995) ("'Even in physical taking cases, compensation must first be sought from the state if adequate procedures are available.'") (quoting Sinaloa Lake Owners Ass'n v. City of Simi Valley, 882 F.2d 1398, 1402 (9th Cir.1 989)). Thus, Williamson County stands for the general proposition that, subject to limited exceptions,[17] a landowner

---

[17] For example, if the federal government committed the alleged taking, the plaintiff would not have to proceed in state court. See, e.g., Hodel v. Irving, 481 U.S. 704, 711 (1987). In addition, a facial attack on an ordinance need not comply with the finality rule. See Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 736, 736 n.10 (1997) ("[F]acial challenges to
(continued...)

cannot prevail on a just compensation claim in federal court until it has failed in its effort to obtain relief through the state courts.[18]

The Supreme Court recently reaffirmed this holding in San Remo Hotel, L.P. v. City & County of San Francisco, 125 S. Ct. 2491 (2005). In that case, the Court explained that a regulatory takings claim "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue," and it confirmed the requirement that a landowner challenging a regulatory taking proceed – at least initially – in state court. Id. at 2507.[19]

---

[17](...continued)
regulation are generally ripe the moment the challenged regulation or ordinance is passed, but face an uphill battle, since it is difficult to demonstrate that mere enactment of a piece of legislation deprived [the owner] of economically viable use of [his] property.") (internal citations and quotations omitted)).

[18] The Second Circuit has noted that "[t]he ripeness requirement of Williamson, although announced in a takings context, has been extended to equal protection and due process claims asserted in the context of land use challenges." Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir. 2002). See also Murphy, 402 F.3d at 349 (observing that Williamson County's ripeness requirement has been extended to equal protection and due process challenges to zoning decisions); Southview Assocs., Ltd. v. Bongartz, 980 F.2d 84, 96-97 (2d Cir. 1992) (applying ripeness requirement to substantive due process claims); Kittay v. Giuliani,112 F. Supp. 2d 342, 349 & n.5 (S.D.N.Y. 2000) ("the ripeness inquiry is the same for each of plaintiff's as-applied takings, due process, equal protection and First Amendment claims."), aff'd, 252 F.3d 645 (2d Cir. 2001). Inasmuch as plaintiff's takings, due process and equal protection claims arise out of the same factual events, the court will apply the same ripeness inquiry to all of plaintiffs' claims. See Dougherty, 282 F.3d at 88-89, 92 n. 7; Goldfine v. Kelly, 80 F. Supp. 2d 153, 158-59 (S.D.N.Y. 2000); Kittay, 112 F. Supp. 2d at 349 & n. 5.

[19] Of course, once a litigant's federal claims related to the merits of the taking are determined in state court, res judicata and collateral estoppel may operate to bar that litigant from bringing his or her claims in federal court. The Supreme Court recently explained in San Remo that permitting federal review of state court awards of just compensation for takings would deny full faith and credit to state court rulings in federal courts. See San Remo, 545 U.S. at 338 (stating that "Congress has not expressed any intent to exempt from the full faith and credit statute federal takings claims" and applying the "normal assumption that the weighty

(continued...)

-18-

Both Williamson County and San Remo arose in the regulatory takings context, where the plaintiffs were seeking just compensation for an alleged taking, and neither involved a challenge to a condemnation under the Fifth Amendment's public use clause. Because just compensation is not an issue in this case, the parties agree that Williamson County's framework is inapplicable here. (See ESDC Mem. at 13; Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, dated Jan. 5, 2007, at 16.)

It is true, as plaintiffs argue, that no Supreme Court precedent directly forecloses the possibility of securing federal jurisdiction by seeking declaratory or injunctive relief under the public use clause, and courts in other circuits have declined to require public use plaintiffs to seek just compensation in state court. See Theodorou v. Measel, 53 Fed. Appx. 640, 643 (3d Cir. 2002) (holding that because "[s]tate takings of private property for private use are not permitted . . . with or without just compensation," a property owner "need not seek compensation for an alleged physical taking for private use through a state procedure in order to ripen [his or her] claim."); Montgomery v. Carter County, 226 F.3d 758, 770-71 (6th Cir. 2000) (takings case held ripe where property owner's driveway had been classified as a public road; state eminent

---

[19](...continued)
interests in finality and comity trump the interest in giving losing litigants access to an additional appellate tribunal"). Indeed, San Remo has been described as "in many ways the most significant" Supreme Court takings case from 2005, "because its combination of ripeness and preclusion doctrines appears to bar the door to federal court for virtually all federal takings claims" and because the Court in that case "emphatically rejected the notion that takings plaintiffs have a right to federal adjudication" Stewart E. Sterk, The Demise of Federal Takings Litigation, 48 WM. & MARY L. REV. 251, 253 (Oct. 2006). See also J. David Breemer, You Can Check Out But You Can Never Leave: The Story of San Remo Hotel – The Supreme Court Relegates Federal Takings Claims to State Courts Under a Rule Intended to Ripen the Claims for Federal Review, 33 B.C. ENVTL. AFF. L. REV. 247, 250 (2006) (criticizing the Supreme Court's decision in San Remo as banishing takings claims to state courts).

domain proceedings "would not supply the appropriate remedy" because plaintiff was not seeking just compensation); Armendariz v. Penman, 75 F.3d 1311, 1320-21 and n.5 (9th Cir. 1996) (en banc) ("Because a 'private taking' cannot be constitutional even if compensated, a plaintiff alleging such a taking would not need to seek compensation in state proceedings before filing a federal takings claim under the rule of Williamson County"); Samaad v. City of Dallas, 940 F.2d 925, 936-37 (5th Cir. 1991) (holding that "a taking for a private purpose is unconstitutional even if the government provides just compensation," but concluding that noise from automobile racing at nearby fairground did not constitute a taking).

However, the instant case is factually distinguishable in that, at this moment in time, there has been no taking of plaintiffs' property. In each of these cases, in which a public use claim was deemed ripe, the alleged taking had already occurred. Thus, even assuming plaintiffs are not required to seek just compensation in state court in order to ripen their claims,[20] the question remains as to when a public use claim relating to a planned condemnation is ripe for adjudication.

The parties have cited no case in this circuit, and the court's independent research uncovered none, explaining precisely when a public use claim is ripe for adjudication. However, Port Chester Yacht Club, Inc. v. Iasillo, 614 F. Supp. 318 (S.D.N.Y. 1985), is instructive. In that

---

[20] It bears noting that the courts are not unanimous on this point. The Seventh Circuit, for example, "has consistently maintained a strict requirement that Takings Clause litigants must first take their claim to state court even when plaintiffs . . . are alleging a taking for private purpose." Daniels v. Area Plan Comm'n, 306 F.3d 445, 453 (7th Cir. 2002) (citing Forseth v. Vill. of Sussex, 199 F.3d 363, 370 (7th Cir. 2000); Covington Court Ltd. v. Vill. of Oak Brook, 77 F.3d 177, 179 (7th Cir. 1996); and Gamble v. Eau Claire County, 5 F.3d 285, 288 (7th Cir.1993)) (finding that the plaintiffs' claim satisfied the futility exception to Williamson County's ripeness requirement, and therefore declining to resolve the tension between the Seventh Circuit's and other circuits' readings of Williamson County).

case the court explained that, in order to support a claim of an unconstitutional taking in violation of the Fourteenth Amendment and § 1983, a plaintiff must establish three elements: "(1) a property interest, (2) that has been taken under the color of state law, (3) without due process or just compensation." Id. at 321 (citing Parratt v. Taylor, 451 U.S. 572, 535-37 (1981); Kohlasch v. N.Y. State Thruway Auth., 460 F. Supp. 956, 960 (S.D.N.Y. 1978)). The plaintiffs in Port Chester challenged an urban redevelopment plan, which was slated to involve the use of eminent domain, on the ground that the planned taking was for private use. The court noted that the plaintiffs were not required to "wait until they are physically evicted before they can claim that they have been deprived of their property without due process of law," but stated that to establish a constitutional violation, a condemnee challenging a taking must show evidence of "'physical entry by the condemnor [or], a physical ouster of the owner [or], a legal interference with the physical use, possession or enjoyment of the property or a legal interference with the owner's power of disposition of the property.'" Id. at 321 n.5 (quoting City of Buffalo v. J.W. Clement Co., 269 N.E.2d 895, 903 (N.Y. 1971)). Plainly stated, "[t]he simple approval of a redevelopment plan can not be considered a deprivation of [a prospective condemnee's] constitutional rights" because "[o]nly when an individual has been deprived of property without due process of law has he been injured in a constitutional sense." Id. at 321. The court therefore dismissed the plaintiff's § 1983 claim, directing it to "take advantage of the adequate state procedures" available to it. Id. at 322. Although, as plaintiffs emphasize, the language of Port Chester Yacht Club focuses almost entirely on the plaintiff's due process claim, it is clear from the opinion that the plaintiff in that case was also seeking injunctive relief under the Fifth Amendment's Public Use Clause, and that the court dismissed that claim on ripeness grounds for

failure to pursue available state remedies.  Id. at 319, 321.

Other decisions demonstrate that federal courts are reticent to adjudicate public use claims until the taking is final.  See, e.g., Wendy's Int'l, Inc. v. City of Birmingham, 868 F.2d 433, 436 (11th Cir. 1989) (public use claims held unripe because the likelihood that the plaintiffs' property would be confiscated had "not yet matured into a credible certainty;" since the redevelopment plan at issue obligated the developer to attempt to reach negotiated settlements with property owners, the threat of condemnation "simply [wa]s too attenuated to stir up an actual controversy."); Frempong-Atuahene v. Redevelopment Auth. of City of Philadelphia, No. 98-0285, 1999 WL 167726, at *3 (E.D. Pa. Mar. 25, 1999) (because plaintiff's public use claims could be vindicated by a favorable outcome in a pending state court action, plaintiff's federal claims were not ripe for federal review), aff'd mem., 211 F.3d 1261 (3d Cir. 2000); Hemperly v. Crumpton, 708 F. Supp. 1247, 1250 (M.D. Ala. 1988) (public use claim held not ripe for disposition where state condemnation proceedings had not yet been initiated); Eddystone Equipment and Rental Corp. v. Redevelopment Authority of Delaware County, Civ. A. No. 87-8246, 1988 WL 52082, *2 (E.D. Pa. May 17, 1988) (citing Williamson County for the proposition that § 1983 claim challenging taking on public use grounds "would not be 'ripe' before the state court rendered final approval of the condemnation."), aff'd mem., 862 F.2d 307 (3d Cir. 1988).  See also Hancich v. Gopoian, 815 F.2d 883, 884 (2d Cir. 1987) (issue of whether decrease in mobile home's resale value due to eviction from lot would constitute a taking of plaintiff's property without due process held premature where no eviction order had yet been entered in state court); Woodfield Equities, L.L.C., 357 F. Supp. 2d at 632 (holding that Village's decision to condemn the property at issue was not "a final action" because the

condemnation still be had to be approved by the Appellate Division under EDPL § 207). These holdings are consistent with general ripeness jurisprudence. As explained above, when the events alleged in a plaintiff's cause of action have not yet occurred or are not certain to occur, a federal court is precluded from exercising subject matter jurisdiction because a real case or controversy does not exist for purposes of Article III. See Auerbach, 136 F.3d at 108.

In opposition, plaintiffs cite Rosenthal & Rosenthal Inc. v. N.Y. State Urban Dev. Corp., 605 F. Supp. 612 (S.D.N.Y. 1985), aff'd, 771 F.2d 44 (2d Cir. 1985) (per curiam), and Hawaii Housing Auth. v. Midkiff, 467 U.S. 229 (1984), in which the courts dismissed public use claims on the merits, with little or no discussion of the ripeness issue. In Rosenthal & Rosenthal, the court found – with scant analysis – that the plaintiffs' suit to enjoin condemnation of their properties was ripe for review because the redevelopment project at issue had been approved by the Board of Estimate, the ESDC had published its Determination and Findings, and the condemnation was "imminent," notwithstanding potential delays due to the pendency of state proceedings challenging the project, which had been filed after commencement of the federal action. Id. at 614-15. Explaining that "[t]he federal courts remain available for challenges to truly private or truly irrational takings,"[21] the court proceeded to dismiss the case for failure to state a cause of action, holding that the plaintiffs could not demonstrate that no public purpose existed for the project. Id. at 619.

In Midkiff, the plaintiffs challenged the constitutionality of the Hawaii Land

---

[21] The court in Rosenthal & Rosenthal gave short shrift to the defendants' abstention argument, stating simply that it saw "no need to abstain in deference to possible state proceedings filed after the commencement of this action." 605 F. Supp. at 615.

Reform Act, which allowed the State to use the power of eminent domain to condemn certain residential land and then sell it to the residential lessees.  See Midkiff v. Tom, 483 F. Supp. 62 (D. Haw. 1979).  The plaintiffs brought suit under the Fifth Amendment's public use clause, and the district court framed the issue as "limited in scope to the question of whether the plaintiffs were denied substantive due process."  Id. at 65.  Explaining that the court's only inquiry was to determine whether the statute furthered "the health, safety, morals, or general welfare of the people of Hawaii," and whether "the means chosen to accomplish that object are rational and not in bad faith," the court found the law constitutional on its face as "within reach of the police power."  Id. at 67.  At the time Midkiff was filed in federal district court, no condemnation actions had yet been filed in the state courts.  See Midkiff v. Tom, 702 F.2d 788, 789 n.1 (9th Cir. 1983).  Nonetheless, no party raised the issue of ripeness and the court did not consider that issue.[22]

These cases, as well as the others cited in plaintiffs' brief, confirm the principle that the pertinent question for ripeness purposes is whether the challenged condemnation is final, imminent, or inevitable.  In Midkiff, although condemnation proceedings had not been commenced, the state had made the statutorily required finding that the acquisition of the lands in question would further the statute's public purposes and had ordered the landowners to submit to compulsory arbitration with their lessees for the purpose of determining the prices at which the properties would be sold.  Id. at 234.  Thus, under Hawaii's law, it was inevitable that the

---

[22]  The Ninth Circuit reversed, holding that the Hawaii Land Reform Act violated the public use clause (see 702 F.2d at 798), and the Supreme Court reversed that decision, concluding that the statute did not violate the Fifth Amendment's public use requirement.  See Hawaii Housing Auth. v. Midkiff, 467 U.S. 229 (1984).  Again, neither court addressed the issue of ripeness.

landowners eventually would be forced to surrender their property.  Likewise, the court in

Rosenthal & Rosenthal characterized the condemnations at issue in that case as "imminent."  605

F. Supp. at 615.  See also Berman v. Parker, 348 U.S. 26, 28-30 (1954) (upholding

constitutionality of the District of Columbia Redevelopment Act of 1945, which was authorized

by Congress to eliminate blight, prior to the commencement of condemnation proceedings

without addressing ripeness issue); Aaron v. Target Corp., 269 F. Supp. 2d 1162, 1176 (E.D.

Mo. 2003) (granting temporary restraining order enjoining state condemnation proceedings and

holding that public use claim was ripe for review because the pending state court action

represented "a manifest and palpable threat that the Properties will be taken in violation of the

Public Use Clause of the Fifth and Fourteenth Amendments."), rev'd on *Younger* abstention

grounds, 357 F.3d 768 (8th Cir. 2004); Cottonwood Christian Ctr. v. Cypress Redevelopment

Agency, 218 F. Supp. 2d 1203, 1215-16 (C.D. Ca. 2002) (granting church's motion for

preliminary injunction against city's condemnation proceedings, where injunction was

authorized under the Religious Land Use and Institutionalized Persons Act and plaintiff  had

already been denied a conditional use permit for church facility construction); 99 Cents Only

Stores v. Lancaster Dev. Agency, 237 F. Supp. 2d 1123, 1127 (C.D. Ca. 2001) (granting

preliminary injunction to enjoin a threatened taking under a city ordinance authorizing

condemnation, even though no condemnation proceeding had begun, where there was a

"reasonable likelihood" that the municipality would initiate condemnation proceedings in the

future), appeal dismissed on mootness grounds, 60 Fed. Appx. 123 (9th Cir. 2003).[23]

---

[23] In 99 Cents Only Stores, the municipality later denied any intention to reinitiate
condemnation proceedings and in fact took significant affirmative and irreversible steps toward
(continued...)

-25-

As all of the above cases reveal, however, the notion of "finality" or "imminence" in this context is amorphous, open to interpretation, and at any rate highly fact-specific. Indeed, two cases decided the same year by different judges on the same court – Rosenthal & Rosenthal and Port Chester Yacht Club – reached seemingly contradictory conclusions in similar factual scenarios. This court's research uncovered no opinion from any jurisdiction citing to both of these cases. Moreover, as the court stressed in Didden v. Village of Port Chester, 304 F. Supp. 2d 548, 569 (S.D.N.Y. 2004), local eminent domain procedures differ materially among jurisdictions; as a result, cases from other jurisdictions have limited precedential value.

It is against this backdrop of conflicting and frequently opaque authority that this court must determine whether the condemnations at issue in this case are sufficiently final or imminent to satisfy Article III's ripeness requirement. However, a separate line of cases, briefly mentioned by plaintiffs and discussed at oral argument, enters into the equation. In Didden, 304 F. Supp. 2d 548, the plaintiff landowners sought injunctive relief staying a condemnation proceeding that the Village of Port Chester had commenced in 2003 in connection with a large-scale redevelopment project. The court found the plaintiffs' § 1983 claims barred by the applicable three-year statute of limitations. It explained that federal law dictates when a federal cause of action accrues and that "a cause of action under 42 U.S.C. § 1983 accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." Id. at 558. The court determined that the plaintiffs "had reason to know of the basis of their injury as soon

[23](...continued)
the implementation of an alternate plan. 60 Fed. Appx. at 125. The Ninth Circuit therefore dismissed the appeal as moot. Id. It is impossible to know whether the district court's injunction was the motivating factor behind the municipality's decision to abandon its initial plan, or whether the condemnation would never have taken place in any event.

as the [Port Chester Board of Trustees] announced its public purpose finding [in July 1999]" and the Village authorized a land disposition agreement with the developer covering the use of eminent domain and finding a legitimate public purpose for condemnation as a means of acquiring property for the project. Id. The court rejected the plaintiffs' argument that they did not suffer an injury until four years later, when the developer allegedly attempted to exact a cash payment from them on threat of condemnation. Id. at 559. Instead, it found the plaintiffs' claims time-barred on the ground that they "were able to, and did in fact, contemplate Port Chester's actions in 1999." Didden v. Vill. of Port Chester, 322 F. Supp. 2d 385, 389 (S.D.N.Y. 2004) (dismissing amended complaint on same grounds), aff'd, 173 Fed. Appx. 931, 2006 WL 898093 (2d Cir. 2006), cert. denied, __ S. Ct. ___, 2007 WL 91474 (Jan. 16, 2007). It stands to reason that if the plaintiffs' claims accrued, for statute of limitations purposes, at the time of the government entity's public purpose finding, then their claims must have been ripe at that point.

Indeed, although ripeness was not an issue in Didden, courts often use the terms "ripeness" and "accrual" interchangeably. See, e.g., W.J.F. Realty Corp. v. Town of Southampton, 351 F. Supp. 2d 18, 23 (E.D.N.Y. 2004) (explaining, in a regulatory takings case, that "[a] claim under section 1983 is not ripe – and a cause of action under section 1983 does not accrue – until" the state denies just compensation.); Williams v. Dow Chem. Co., No. 01 Civ. 4307, 2004 WL 1348932, at *7 (S.D.N.Y. June 16, 2004) ("Fully ripened claims having accrued more than three years prior to the institution of this suit, the section 349 and 350 claims [under the New York General Business Law] are barred by the statute of limitations."); Argonaut P'ship, L.P. v. Bankers Trustee Co., No. 96 CIV. 1970, 96 CIV. 2222, 1997 WL 45521, at *5 (S.D.N.Y. Feb. 4, 1997) ("This action meets the first prong of the ripeness inquiry [under Abbott

Labs. and its progeny]: it is now fit for review because plaintiffs' claim has accrued and its

viability does not depend upon the occurrence of any contingent event.").  This makes sense, as

both inquiries center around the timing and significance of the plaintiff's injury.  See Pearl v.

City of Long Beach, 296 F.3d 76, 80 (2d Cir. 2002) (explaining that a claim accrues for statute

of limitations purposes "when the plaintiff knows or has reason to know of the injury which is

the basis of [her] action.") (internal quotation marks omitted); Dougherty v. Town of N.

Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 90 (2d Cir. 2002) ("The purpose of the ripeness

requirement is to ensure that a dispute has generated injury significant enough to satisfy the case

or controversy requirement of Article III of the U.S. Constitution.").

        Assessing this case on its unique facts, as the court must, I find plaintiffs' injuries

sufficiently concrete to be considered ripe for judicial review.  To be sure, the ESDC cannot

acquire ownership of plaintiffs' properties until it has commenced an Article 4 proceeding in

state court, and any number of things – foreseeable or not – could happen to derail the Project in

the meantime.[24]  However, under Didden, plaintiffs' claims accrued when the ESDC issued its

final Determination and Findings of public use, benefit or purpose pursuant to EDPL §

204(B)(1).  Although the Determination and Findings effects no immediate change in plaintiffs'

ability to use their properties, defendants do not point to any further legal or administrative

impediments to the condemnations at issue in this case.

        The EDPL § 207 proceeding currently pending in state court cannot eliminate or

---

[24]  The ESDC defendants offer a few examples of development projects that stalled or
were abandoned after the condemning authority issued its Determination and Findings.  (See
Memorandum of Law of ESDC Defendants in Support of Their Motion to Dismiss the Amended
Complaint, dated Jan. 19, 2007, at 14-15.)  However, they do not suggest that there is any danger
of the Atlantic Yards Project meeting a similar fate.

-28-

lessen all of plaintiffs' injuries in this case, as the petitioners in the state case are non-condemnees and have narrowly tailored their petition to seek only rejection of the Determination and Findings "with respect to the acquisition of 624 Pacific Street and 473 Dean Street Brooklyn"[25] and relocation into equivalent housing. On its face, the state petition does not challenge the condemnations on public use grounds. (See Declaration of Douglas M. Kraus, Esq., dated Jan. 19, 2007, Ex. A ¶ 3 (stating, "Petitioners believe that as non-condemnees, they lack standing in this proceeding to challenge the condemnation itself.")[26]

Little need be said about the second prong of the Abbott Labs test, *i.e.*, the potential hardship to plaintiffs. Clearly, the proposed condemnations, and the consequent dispossession of plaintiffs from their homes and businesses, pose a significant threat of harm.

In short, there is a real dispute between the parties. I therefore respectfully recommend that defendants' motions to dismiss this case for lack of ripeness be denied.

C. Abstention

In the alternative, defendants urge this court to abstain from exercising jurisdiction in this case, either under Younger v. Harris, 401 U.S. 37, 45 (1971), or Burford v. Sun Oil Co., 319 U.S. 315 (1943). Younger established the principle that federal courts should

---

[25] Only one of the named plaintiffs in the instant case, Joseph Pastore – a rent-controlled tenant who lives at 473 Dean Street – resides in one of the buildings at issue in the state case. (See Am. Compl. ¶ 20.)

[26] The petition does allege that the ESDC's exercise of eminent domain to facilitate the construction of "private roads" is unconstitutional (see Declaration of Douglas M. Kraus, Esq., dated Jan. 19, 2007, Ex. A ¶ 11), but it does not invoke the Fifth Amendment's public use clause explicitly. Since the preceding paragraph refers to the New York Constitution (specifically, Art. 1 § 7(c), regarding private roads and the right to a "jury of freeholders"), the petition does not appear to assert any claims under the federal constitution.

not enjoin or interfere with ongoing state proceedings. <u>Burford</u>, on the other hand, requires a federal court to dismiss a case involving an area of traditional state power when the exercise of federal jurisdiction would have a disruptive effect on "state efforts to establish a coherent policy with respect to a matter of substantial public concern." <u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800, 814 (1976).

Underlying both abstention doctrines is a concern for comity and federalism expressed in "the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." <u>Younger</u>, 401 U.S. at 44. <u>See also</u> <u>Quackenbush v. Allstate Ins. Co.</u>, 517 U.S. 706, 728 (1996) (explaining that a court's decision to abstain "must reflect 'principles of federalism and comity.'") (quoting <u>Growe v. Emison</u>, 507 U.S. 25, 32 (1993)); <u>Spargo v. N.Y. State Comm'n on Judicial Conduct</u>, 351 F.3d 65, 74-75 (2d Cir. 2003) (noting that <u>Younger</u> abstention is a prudential limitation on the court's exercise of jurisdiction "grounded in equitable considerations of comity" and "serves the vital purpose of 'reaffirm[ing] the competence of the state courts,' and acknowledging the dignity of states as co-equal sovereigns in our federal system.") (citing <u>Diamond "D" Constr. Corp. v. McGowan</u>, 282 F.3d 191, 197 (2d Cir. 2002)), <u>cert. denied</u>, 541 U.S. 1085; <u>Youell v. Exxon Corp.</u>, 48 F.3d 105, 108 (2d Cir.) (<u>Burford</u> and <u>Younger</u> "extricate the federal courts from situations where the assertion of jurisdiction would intrude into the state courts' proper domain."), <u>vacated on other grounds</u>, 516 U.S. 801 (1995). However, because "federal courts have a 'virtually unflagging' obligation to exercise the jurisdiction given them" (<u>Colorado River</u>, 424 U.S. at 817), abstention "is the narrow exception, not the rule." <u>Cecos Int'l, Inc. v. Jorling</u>, 895 F.2d 66, 70 (2d Cir. 1990) (citing <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>,

460 U.S. 1, 14 (1983)).  See also County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188

(1959) ("the doctrine of abstention . . . is an extraordinary and narrow exception to the duty of a

District Court to adjudicate a controversy properly before it.  Abdication of the obligation to

decide cases can be justified under this doctrine only in the exceptional circumstances where the

order to the parties to repair to the state court would clearly serve an important countervailing

interest.").

       I am not persuaded that the Younger doctrine applies here.  In Middlesex County

Ethics Commission v. Garden State Bar Association, 457 U.S. 423, 432 (1982), the Supreme

Court established a three-part test for Younger abstention in non-criminal state proceedings: (1)

whether the state proceedings constitute ongoing state judicial proceedings; (2) whether the state

proceedings implicate important state interests; and (3) whether state procedures are available

that allow the plaintiffs to raise their federal claims in state court.  If all three factors are

satisfied, the district court should abstain from exercising federal jurisdiction unless the state

proceeding was commenced in bad faith, was filed for the purpose of harassing the plaintiffs, or

if other unusual circumstances warrant the court's intervention.  See id. at 435.  For Younger

abstention, the key question is whether "there is an ongoing state proceeding involving an

important state interest that provides the federal plaintiff with an adequate opportunity for

judicial review of its federal . . . claims."  Temple of Lost Sheep Inc. v. Abrams, 930 F.2d 178,

182 (2d Cir. 1991).  Moreover, it is imperative that the ongoing state proceedings be "'judicial in

nature.'"  New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans, 491 U.S. 350,

361 (1989) ("NOPSI") (quoting Middlesex County, 457 U.S. at 433-34).  See also Marisol A. by

Forbes v. Giuliani, 929 F. Supp. 662, 688 (S.D.N.Y. 1996) ("[t]he existence of an ongoing state

court proceeding is crucial to this inquiry.").

In the instant case, there is no pending state court proceeding in which plaintiffs will have the opportunity to present the federal claims raised in the instant complaint. Plaintiffs did not commence a § 207 proceeding in the Appellate Division and their time to do so has expired.[27] Although the ESDC has stated its intention to commence an Article 4 proceeding to condemn the properties at the appropriate time, that future action does not justify a refusal to assume jurisdiction under Younger. See Cecos Int'l, Inc., 895 F.2d at 72 ("A federal court need not stay its jurisdictional hand when there is no state action pending at the time the federal suit is filed, even if there is a substantial likelihood that a state proceeding will be instituted in the future to vindicate the state's interests.").

There is one ongoing state court proceeding contesting the ESDC's Determination and Findings with respect to two specific properties, but that proceeding will not necessarily address or resolve the claims plaintiffs assert in this matter, as the petitioners in the state case do not challenge the condemnations. (See Declaration of Douglas M. Kraus, Esq., dated Jan. 19, 2007, Ex. A.) In short, this court's consideration of plaintiffs' claims would not interfere directly with any pending state court proceedings.[28] Accordingly, the action currently pending in

_____

[27] In addition, even if the present action is deemed to toll the limitations period for filing a § 207 claim in state court, it is well-settled that "whether the federal plaintiff has an 'opportunity' to have the issue addressed in state court for Younger purposes does not turn on whether the plaintiff could file a new complaint in state court that alleged [his or] her federal claims." Habich v. City of Dearborn, 331 F.3d 524, 531 (6th Cir. 2003).

[28] Defendants assert that the five stages of the EDPL constitute a single, unitary proceeding, the focus of which is to determine, through judicial means, whether the condemnor's decision should be validated as being in accordance with the law, and what compensation should
(continued...)

state court cannot trigger abstention under Younger.

However, I do find Burford abstention appropriate in this case. Under Burford:

> Where timely and adequate state-court review is available, a
> federal court sitting in equity must decline to interfere with the
> proceedings or orders of state administrative agencies: (1) when
> there are 'difficult questions of state law bearing on policy
> problems of substantial public import whose importance
> transcends the result in the case then at bar'; *or* (2) where the
> exercise of federal review of the question in a case and in similar
> cases would be disruptive of state efforts to establish a coherent

---

[28](...continued)
be paid if a taking occurs. (ESDC Mem. at 23 (citing Didden, 304 F. Supp. 2d at 564).) They
therefore argue that every stage of the EDPL is judicial in nature. Defendants' argument is
misplaced. The EDPL is a single legislative scheme with sequential proceedings, some of which
are judicial and some of which are not. As described above, the first judicial proceeding takes
place if and when a prospective condemnee files a claim in the Appellate Division under EDPL §
207. Defendants have cited no case, and the court knows of none, that has extended Younger
abstention doctrine to non-judicial proceedings such as a public hearing of the nature prescribed
in EDPL § 201.

Didden is distinguishable because, at the time of the court's decision in that case,
the state condemnation proceeding was at the Article 4 stage. Didden, 304 F. Supp. 2d at 565.
There can be no doubt that an Article 4 proceeding is "judicial in nature" and that, had the
district court not abstained, it would have interfered directly with "ongoing state judicial
proceedings" in which the plaintiffs could, at an earlier stage, have raised their federal claims. In
the instant case, by contrast, there is no state proceeding pending that can clearly be considered
"judicial in nature" and in which plaintiffs will have the opportunity to assert their federal
claims.

Defendants also cite Spargo, 351 F.3d 65, for the proposition that administrative
proceedings that have "fact-finding" as their "primary mission" are as deserving of comity as
pending state judicial proceedings. Spargo involved a First Amendment challenge to three New
York rules of judicial conduct, where the plaintiff – an elected New York State judge – sought to
enjoin pending disciplinary proceedings commenced by the New York State Commission on
Judicial Conduct. The Second Circuit held that the district court should have abstained under
Younger, because the disciplinary proceedings afforded adequate opportunity for the plaintiff to
raise his constitutional claims before a "competent state tribunal." Id. at 73, 77 (citing
Middlesex County Ethics Comm'n, 457 U.S. at 437). The Article 2 proceedings in this case are
not analogous, as there is no proceeding currently pending before a court or tribunal in which the
plaintiffs may have their federal claims addressed.

> policy with respect to a matter of substantial public concern.

NOPSI, 491 U.S. at 361 (quoting Colorado River, 424 U.S. at 814) (emphasis added).  Burford

abstention "enables federal courts to refrain from becoming involved with state policymaking

and enforcement procedures in complex areas which are primarily the state's concern."  Soc'y

for Good Will to Retarded Children v. Cuomo, 652 F. Supp. 515, 523 (E.D.N.Y. 1987).  See also

Surowitz v. N.Y. City Employees' Ret. Sys. 376 F. Supp. 369, 376 (S.D.N.Y. 1974) (Burford

abstention "permits a federal court, in the exercise of its discretion, to relinquish jurisdiction

where necessary to avoid needless conflict with the administration by a state of its own affairs.").

A decision to abstain under Burford must be "based on a careful consideration of

the federal interests in retaining jurisdiction over the dispute" and ultimately represents a

determination "that the State's interests are paramount and that [the] dispute would best be

adjudicated in a state forum."  Burford, 319 U.S. at 327.  As the Supreme Court explained in

Quackenbush,  517 U.S. at 727-28, there is no "formulaic test for determining when dismissal

under Burford is appropriate."  Rather, the court must consider "the federal interests in retaining

jurisdiction over the dispute" as well as "the competing concern for the 'independence of state

action.'"  Id. (quoting Burford, 319 U.S. at 334).  "This equitable decision balances the strong

federal interest in having certain classes of cases, and certain federal rights, adjudicated in

federal court, against the State's interests in maintaining uniformity in the treatment of an

essentially local problem."  Id. (internal quotes and citations omitted).  See also NOPSI, 491

U.S. at 363 (question under Burford is whether adjudication in federal court would "unduly

intrude into the processes of state government or undermine the State's ability to maintain

desired uniformity").  Where the state's interest in carrying out its domestic policy predominates,

and proceedings in federal court "are likely to add nothing to, or even detract from, the state's well organized system of regulation and review," the district court may abstain "without finding, in addition, a state issue or unclarity in the pertinent state law." Arnav Indus., Inc. v. Dreskin, 551 F. Supp. 461, 463-64 (S.D.N.Y. 1982) (citing BT Inv. Managers, Inc. v. Lewis, 559 F.2d 950, 955 (5th Cir. 1977), aff'd in part and vacated in part on other grounds, 447 U.S. 27 (1980)).

In determining whether to invoke Burford abstention, the Second Circuit has outlined a number of factors to be considered, including "[1] the degree of specificity of the state regulatory scheme, [2] the necessity of discretionary interpretation of state statutes, and [3] whether the subject matter of the litigation is traditionally one of state concern." Planned Parenthood of Dutchess-Ulster, Inc. v. Steinhaus, 60 F.3d 122, 127 (2d Cir. 1995) (citing Bethphage Lutheran Serv., Inc. v. Weicker, 965 F.2d 1239, 1243 (2d Cir. 1992)). These three factors "should inform the deliberation of a court," but all three need not be satisfied. Feiwus v. Genpar, Inc., 43 F. Supp. 2d 289, 295 (E.D.N.Y. 1999). Rather, "[u]nder Burford and its progeny, a finding that the case at bar implicates the first and *either* of the second or third factors" weighs in favor of "finding that the state['s] interest in adjudicating the case in its own forum outweighs the federal interest in retaining jurisdiction." Id. (emphasis added).

Here, the first and third factors weigh in favor of abstention. First, New York's EDPL sets forth a highly specific and comprehensive mechanism for condemnees to challenge any aspect of a condemnation in a state-created system of administrative and judicial review. The statute itself recites that its purpose is "to provide the exclusive procedure by which property shall be acquired by exercise of the power of eminent domain in New York state." EDPL § 101. See also Jackson, 494 N.E.2d at 436 (explaining that the EDPL "was enacted in 1977 to supplant

a mosaic of more than 150 scattered provisions with a uniform procedure.").  This court must respect the state's concern for rationalizing and centralizing its eminent domain laws.  See Rucci v. Cranberry Twp., Pa., 130 Fed. Appx. 572, 577, 2005 WL 1111764, at *5 (3d Cir. 2005) (explaining that eminent domain is a "distinctly state-law matter," as evidenced by Pennsylvania's "extensive Eminent Domain Code" which "supplies a complete and exclusive procedure and law to govern all condemnations of property for public purposes and the assessment of damages therefor. . . .") (internal quotes and citation omitted); Coles v. City of Philadelphia, 145 F. Supp.2d 646, 652 (E.D. Pa. 2001) (abstaining under Burford where state statute declared that it was intended "to provide a complete and exclusive procedure and law to govern all condemnations of property for public purposes."), aff'd, 38 Fed. Appx. 829 (3d Cir. 2002).

Second, it is indisputable that eminent domain is traditionally a matter of local concern and that the state has a vital interest in establishing a coherent policy with respect to it. See Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 26, 29 (1959) (explaining that "'[t]he fundamental fact is that eminent domain is a prerogative of the state, which on the one hand, may be exercised in any way that the state thinks fit, and, on the other, may not be exercised except by an authority which the state confers'" and holding that federal courts should abstain from deciding eminent domain cases due to the need to maintain "harmonious federal-state relations in [] matter[s] close to the political interests of a State.") (quoting Madisonville Traction Co. v. St. Bernard Mining Co., 196 U.S. 239, 257 (Holmes, J., dissenting)).  See also United States v. Certain Lands in City of Louisville, Jefferson County, Ky., 78 F.2d 684, 687 (6th Cir. 1935) ("[T]here is nothing in the Fourteenth Amendment to

prevent a state from exercising the power of eminent domain to carry into effect a public policy

which, in the light of the needs and exigencies of the state, may be regarded as promotive of the

public interest.").  Indeed, courts have consistently viewed the exercise of eminent domain

power as an issue in which the state has an overriding interest.  See Emeryville Redevelopment

Agency v. Clear Channel Outdoor, No. C 06-01279, 2006 WL 1390561, at *4-5 (N.D. Cal. May

22, 2006) (abstaining from condemnation case in order to avoid "needlessly interfer[ing]" with

the state's regulatory scheme; case required the court "to balance the state's policy for protecting

the environment with the state's interest in addressing the housing needs of its growing

population," and "[c]omity requires that the federal courts allow the state courts to make such

policy determinations."); Mateo v. Phillips, 361 F. Supp. 2d 328, 330 (S.D.N.Y. 2005)

(dismissing case on Younger abstention grounds and noting that "all eminent domain

proceedings . . . implicate important state interests."); Frempong-Atuahene, 1999 WL 167726, at

*4 (stating, in condemnation case, that the "essentially local character of this dispute and the

availability of constitutional remedies in state court argue strongly against federal intervention");

Dickie v. City of Tomah, 782 F. Supp. 370, 374 (N.D. Ill. 1991) (describing eminent domain as

"a matter of uniquely local concern."); Broadway 41st St. Realty Corp. v. N.Y. State Urban Dev.

Corp., 733 F. Supp. 735, 742 (S.D.N.Y. 1990) (explaining, as part of Younger abstention

inquiry, that "[d]ue to the sensitive nature of the state's power to condemn the land of its

citizens, eminent domain has remained a local political issue."); Dash v. Frech, No. 88-C-5001,

1989 WL 75422, at *3 (N.D. Ill.  June 20, 1989) (holding that the court was "compelled by the

principles of comity and federalism to abstain from interfering with the eminent domain

proceedings which are uniquely a matter of local concern.")[29]

The Supreme Court echoed this view in <u>Kelo v. City of New London</u>, 545 U.S. 469, 125 S. Ct. 2655 (2005), in which it stressed the "strong theme of federalism" in the Court's takings jurisprudence, "emphasizing the 'great respect' that we owe to state legislatures and state courts in discerning local public needs." <u>Id.</u>, 125 S. Ct. at 2664 (citing <u>Hairston v. Danville & Western R.R. Co.</u>, 208 U.S. 598, 606-07 (1908)). <u>See also</u> <u>San Remo</u>, 125 S. Ct. at 2507 (noting that "state courts undoubtedly have more experience than federal courts do in resolving the complex factual, technical, and legal questions related to zoning and land-use regulations.")[30]

Plaintiffs have good reasons for preferring federal court over state court, not the

---

[29] Plaintiffs' reliance on <u>Minnich v. Gargano</u>, No. 00 Civ. 7481, 2001 WL 46989 (S.D.N.Y. Jan. 18, 2001) is misplaced. In <u>Minnich</u>, the plaintiffs alleged that sections of the EDPL were unconstitutional under the Fourteenth Amendment's due process clause. Specifically, they argued that the EDPL (which has since been amended) was unconstitutional for failure to require personal notice of the public hearing, the Determination and Findings, and the property owner's right to appeal, and for failure to provide an adversarial hearing or a proper forum for the property owner to be heard. <u>Id.</u> at *6. Acknowledging that "the eminent domain power is traditionally an area of state concern," the district court declined to abstain under <u>Burford</u>, holding that "the issues of due process involved here are overriding issues of federal constitutional concern." <u>Id.</u> at *5. The instant case is distinguishable in that it presents no direct facial challenge to any provision of the EDPL. <u>See</u> <u>Dittmer v. County of Suffolk,</u> 146 F.3d 113, 117 (2d Cir. 1998) (<u>Burford</u> abstention not warranted in a facial challenge to the constitutionality of a state statute, which is the type of controversy "federal courts are particularly suited to adjudicate.").

At any rate, the Second Circuit vacated the preliminary injunction granted in <u>Minnich</u>, holding that plaintiff Brody did not suffer any actual or threatened injury and thus lacked standing to bring his claims. <u>Brody v. Vill. of Port Chester</u>, 261 F.3d 288, 290 (2d Cir. 2001). Accordingly, the Second Circuit had no reason to review the <u>Burford</u> abstention arguments.

[30] At oral argument, plaintiffs' counsel all but conceded this point. (<u>See</u> Tr. at 37 ("The third factor is, you know, certainly a factor that militates towards the defendant[s'] argument."))

least of which is the lack of access to discovery in state court proceedings under the EDPL.[31]  As

defendants point out, allowing plaintiffs to do an end-run around the EDPL and instead litigate

their claims in federal court would provide incentive for forum shopping and thereby undermine

New York's legislative scheme governing the exercise of eminent domain power.  No

prospective condemnee, given the choice, would opt for narrow, on-the-record (yet

constitutionally adequate) review in the Appellate Division if all of the benefits of federal review

were freely available.[32]

   The fact that plaintiffs have chosen not to commence an EDPL § 207 proceeding

in the Appellate Division is of no moment, since "the lack of a pending state court action creates

no preclusion of [Burford] abstention."  Coles v. Street, 38 Fed. Appx. 829, 831 (3d Cir. 2002)

(citing Eddystone Equip. and Rental Corp., 1988 WL 52082, at *1).  See also Stoe v. Flaherty,

436 F.3d 209, 213 (3d Cir. 2006) ("the existence of an ongoing state proceeding is not inherent

in the nature of abstention.  Burford, Pullman, and Thibodaux abstention, as well as other forms

of abstention, apply without regard to the existence of an ongoing proceeding.")  To the contrary,

Burford abstention "is appropriate [where] state review is *available*."  Coles, 38 Fed. Appx. at

831 (emphasis added).  Plaintiffs do not deny that state court review was available to them.  In

---

[31] As one court has explained, "under the EDPL, the [condemning authority] holds
nearly all the cards, with any aggrieved party having little right to participate in the initial
determination and limited right to judicial review thereafter."  Buffalo S. R.R. Inc. v. Vill. of
Croton-on-Hudson, 434 F. Supp. 2d 241, 254 (S.D.N.Y. 2006) (citing Brody, 434 F.3d at
132-33).

[32] As a matter of public policy, the availability of discovery could reasonably be
expected to promote a full and robust public debate and enhance the likelihood of rational
decision-making.  However, the constitutionality of the EDPL is not in question in this litigation,
and it is not the place of the federal courts to determine public policy in areas of state and local
concern such as eminent domain.

fact, plaintiffs confidently assert that state court review will remain available to them, under the

tolling provision of 28 U.S.C. § 1367(d), if this court dismisses their claims. Nor do plaintiffs

argue that the state courts are incompetent to decide their federal constitutional claims.

In Didden, 304 F. Supp. 2d 548, the court held that the plaintiffs had waived their

right to challenge the public purpose of the redevelopment project at issue by failing to bring

their claims in state court within the exclusive thirty-day limit set forth in EDPL § 207. The

court stated:

> Even if Plaintiffs could have made a showing of non-public use, it
> is too late for them to do so now. Port Chester issued its public
> purpose findings in July 1999. Under the EDPL, Plaintiffs and
> others were allowed thirty days to challenge the public purpose
> finding in state court. . . . Plaintiffs failed to do so. Plaintiffs do
> not (and cannot) allege that they failed to receive notice of Port
> Chester's declaration of public purpose. *To allow Plaintiffs to
> challenge the public purpose of the Redevelopment Project now
> would contradict the express provisions of the EDPL, and
> undermine New York's constitutional unitary scheme for the
> condemnation of property.*

Id. at 560 (emphasis added). Didden is correct on this point; as the Second Circuit has

explained, "'[a] claimant cannot be permitted to let the time for seeking a state remedy pass

without doing anything to obtain it and then proceed in federal court on the basis that no state

remedies are open.'" Vandor, Inc, 301 F.3d at 39 (quoting Gamble v. Eau Claire Co., 5 F. 3d

285, 286 (7th Cir. 1993)).

Plaintiffs attempt to circumvent this problem by bringing a supplemental state law

claim under EDPL § 207.[33] That effort is unavailing. It is true that plaintiffs' EDPL claim forms

---

[33] As defendants point out, EDPL § 207 states that the "jurisdiction of the appellate

(continued...)

-40-

part of the same case or controversy as plaintiffs' claim under the Fifth Amendment's public use clause. <u>See</u> 28 U.S.C. § 1367 (stating that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.") However, in light of my recommendation that this court dismiss plaintiffs' federal claims on <u>Burford</u> abstention grounds, their supplemental state law claim may be dismissed under 28 U.S.C. § 1367(c)(3), which permits district courts to decline to exercise supplemental jurisdiction over a claim if it has "dismissed all claims over which it has original jurisdiction." Put another way, plaintiffs cannot avoid the consequences of <u>Burford</u> abstention by bootstrapping a § 207 claim onto their federal claims.

In short, this action presents important public policy concerns and is essentially local in nature. Because the state's interest in adjudicating this case in its own forum outweighs

---

[33](...continued)
division of the supreme court shall be exclusive." This would seem to strip the federal courts of jurisdiction over the state law claim. <u>See</u> <u>Town of Haverstraw v. Barreras</u>, 361 F. Supp. 2d 317, 319 (S.D.N.Y. 2005) ("challenges to condemnations under [Article 4 of the] EDPL are within the exclusive jurisdiction of New York state courts.") (citing EDPL §§ 207(B), 501(B); <u>Sun Co. v. City of Syracuse Indus. Dev. Agency</u>, 602 N.Y.S.2d 456, 457 (4th Dep't 1993)). However, as plaintiffs correctly assert and defendants acknowledge, state law cannot dictate whether or when a federal court may assert jurisdiction over a supplemental state law claim. (<u>See</u> Plaintiffs' Opposition to Defendants' Motion to Dismiss Supplemental EDPL Claims, dated Jan. 26, 2007, at 2 (citing cases); <u>see also</u> Memorandum of Law of ESDC Defendants in Support of Their Motion to Dismiss the Amended Complaint, dated Jan. 19, 2007, at 10 n.6 (recognizing that "'there would be substantial doubt as to the constitutionality of a state law purporting to preclude . . . pendent jurisdiction over a state-created claim.'" (quoting <u>TBK Partners v. Western Union Corp.</u>, 675 F.2d 456, 460 n.3 (2d Cir. 1982)). Moreover, as plaintiffs argue, this provision is more properly interpreted as making clear that claims under EDPL § 207 must be brought in the Appellate Division as opposed to New York Supreme Court or another state court.

the federal interest in retaining jurisdiction, I respectfully recommend that this court abstain under <u>Burford</u> and dismiss plaintiffs' amended complaint without prejudice.

Plaintiffs' Amended Complaint raises serious and difficult questions regarding the exercise of eminent domain under emerging Supreme Court jurisprudence, many of which were explored in some detail at oral argument. However, in light of my recommendation that this court abstain, it would be inappropriate to address plaintiffs' claims on the merits.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that this action be dismissed on <u>Burford</u> abstention grounds without prejudice. Any objections to this Report and Recommendation must be filed with the Clerk of Court, with courtesy copies to Judge Garaufis and to my chambers, within ten (10) business days. Failure to file objections within the specified time waives the right to appeal the district court's order. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: Brooklyn, New York
         February 23, 2007

                                        Respectfully submitted,


                                        _____/s/_____
                                        ROBERT M. LEVY
                                        United States Magistrate Judge